UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,
                    Plaintiff,
    v.
                                Case No. 09 CR 118

Robert Farrell,
                    Defendant.
_____

**SENTENCING MEMORANDUM**
_____

**INTRODUCTION**

As the court is well aware a court must impose a sentence under 18 U.S.C. §3553 which is "sufficient but not greater than necessary" to achieve the purposes set forth in that statute. Those purposes are well known to the court and will not be repeated here. This memo will address two of those purposes which are especially significant in evaluating the requisite length of the defendant's sentence.

*The nature and circumstances of the offense*
*(Farrell's involvement)*

It is clear that a lot of banks, or mortgage lenders, or insurance companies or bondholders suffered large financial losses as a result of a scheme concocted by Mr. Zaleski, the husband of Mr. Farrell's mother. However, Mr. Farrell entered the situation with good intentions, and had no real grasp of the extensive nature of the fraud involved. To him, the whole thing was just a bad job, and all the harm (exposed after he was long

gone) seemed the result of business as usual.

By 2004 Mr. Farrell's life was pretty much a mess. He already had a couple of drug/alcohol arrests and convictions on his record and was using alcohol and marijuana heavily.  He was also likely suffering from depression (not diagnosed until 2007). At that time, and probably out of genuine concern, Mr. Zaleski offered to hire Farrell "to teach him a trade he could use the rest of his life."  The plan was to learn the business and become a mortgage broker, which seemed at the time a viable career path.

At that time Zaleski was assiocated with Chuck Cermak, and Farrell was working mostly with Mr. Cermak, in Antioch, Illinois. Mr. Cermak, to Farrell's knowledge, was legitimate, and was teaching Farrell various aspects of the mortgage business. Farrell was paid to find borrowers, and performed tasks such as handing out flyers, cold calling and the like.  He also answered the phones, did odd jobs around the office, and learned the business from Mr. Cermak.

Sometime around 2005 (Mr. Farrell has a terrible memory, probably because of his heavy drug and alcohol use at the time) Zaleski and Cermak split because of the direction the business was taking. Farrell began working solely in the Wisconsin office, along with many other people (both indicted and not).

He noticed a difference in the way business was conducted. Whereas with Mr. Cermak there was an emphasis on volume, when he began working in Wisconsin it evolved that there seemed to only

be work on very few loans at a time. Farrell was involved in the preparation of documents, but essentially only did as he was told. He also did various other jobs at the office, and did attend a few closings. Zaleski would tell him what to do and he would do it. However, he was aware that some of the things he was doing, including putting false numbers on documents and changing numbers to get loans through with lenders, seemed improper.

As counsel for co-defendant Pembroke recently noted, this was a common industry practice. In fact it was a common practice nationally, and it seems unlikely the "victims" in this matter were not well aware of what occurred. However, the true victims, such as those who legitimately paid home prices that were inflated by schemes such as Zaleski's, were damaged, and there were many others who suffered collateral damage. Mr. Farrell is well aware of that.

As both parties have stipulated, Mr. Farrell played a minor role in the fraud. He left the office in 2006. He did not hold any kind of management position, he essentially did what he was told, and he did not share in the "profits" from the enterprise. He was paid on an irregular basis and had no decision making authority. By the end of his employment he was only coming to the office for about two hours a day.

He had hoped to learn a legitimate trade, but he moved across country to learn and participate in a low paying fraud.

He has and continues to acknowledge his responsibility for what he did, but he was not anywhere near the same level of culpability as any of his co-defendants.

### *The history and characteristics of the defendant*

Mr. Farrell scores eight criminal history points. Every one of these points concerns drug and/or alcohol offenses. Even his retail theft conviction involved stealing alcohol.

Mr. Farrell would be a prime candidate for treatment, except he has already successfully completed it. After spending 20 days in custody, Mr. Farrell then spent 10 months at Oxford House, which is a group home/treatment center. He was fully compliant and remains sober to this day, some 17 months later.

Mr. Farrell prefers sobriety, and values his better judgment of the present time. His sobriety likely diminishes his risk of recidivism, not just for financial crimes such as this, but also crimes such as those he committed in the past. His rehabilitative needs have been addressed as much as possible by the judiciary system.

Mr. Farrell is now employed, learning a trade, and involved in a committed relationship. The presentence establishes the strides he has made, and establishes that he overcame far more than mentioned here. As such, the defendant argues that the government's sentencing recommendation is reasonable, and asks that the court sentence him to a straight probation sentence.

Dated: August 19, 2011

s/_____
Matt Ricci

P.O. Address:
316 N. Milwaukee, Suite 206
Milwaukee, WI 53202
(414) 271-5128